Filed 1/26/21  B.P. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| B.P., | |
| Petitioner, | E076082 |
| v. | (Super.Ct.No. RIJ900163) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | OPINION |
| Respondent; | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Cheryl C. Murphy, Judge.  Petition denied.

David Goldstein for Petitioner.

No appearance for Respondent.

Gregory P. Priamos, County Counsel, James E. Brown, Anna M. Marchand and Prabhath D. Shettigar, Deputy County Counsel for Real Party in Interest.

1

Petitioner B.P. (Mother) has filed a petition for extraordinary writ pursuant to California Rules of Court, rule 8.452. Mother claims that the juvenile court erred in terminating reunification services and in setting a hearing under Welfare and Institutions Code[1] section 366.26 because Mother was not afforded or offered reasonable services. For the reasons set forth below, we deny Mother's writ petition.

## FACTUAL AND PROCEDURAL HISTORY

On March 29, 2019, the Riverside County Department of Public Social Services (the Department) filed a section 300 petition on behalf of M.G. (Minor; a girl born August 2011). Minor was placed in foster care. Minor's father is deceased.

On March 15, 2019, the Department received a physical and general neglect referral. The social worker tried to meet with Minor at her school but Minor had been absent the past two days. The assistant principal told the social worker that they had been concerned about Minor's behavior for some time. Minor had been "twerking," hitting, and choking other students. Although the school referred Minor to counseling, Mother failed to follow through on getting Minor to counseling.

When the social worker called Mother, she refused to meet the social worker. Mother also would not allow the social worker to see or speak to Minor that day.

On March 21, 2019, the social worker met with Minor at her school. Minor appeared free of any visible marks or bruises. Minor told the social worker that her Mother tried to hit her with a vacuum cord that morning because Minor needed help

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

putting her shoes on. When Minor cried, Mother hit Minor with a "house shoe." Minor stated that Mother "hits me, slaps me . . . she'll punch me in the mouth, slap me dead in the face." Minor told the social worker that Mother went to jail for hitting and punching the maternal grandmother (MGM). Minor also stated that Mother stabbed Minor's father with a knife and scissors in the back.

Additionally, Minor told the social worker that Mother sometimes used drugs; she described how the drugs looked and smelled. Minor also stated that Mother "drinks alcohol and acts crazy. She shakes me, wakes me up in the middle of the night. She is drunk. I don't like it when she drinks." Minor stated that Mother did not treat her right. Mother did not take her to the dentist; Minor showed the social worker her teeth, which were brown and rotten.

Regarding the incident that led to the referral, Minor stated that Mother punched her in the eye twice. MGM was present.

On March 21, 2019, the social worker met with a relative; Mother had threatened to kill the relative if she called the police or child protective services. Mother's friends had contacted the relative to report Mother's drug use. The relative reported that Mother woke Minor up in the middle of the night to threaten her with violence. Minor had told the relative that she wanted to kill herself in the past.

On March 25, 2019, the social worker contacted MGM. MGM stated that she would file for guardianship of Minor by March 28, 2019. On March 26, MGM contacted the social worker and told her she did not feel comfortable filing for guardianship

3

because Mother lived in the home. MGM stated, "I am scared [Mother] is going to do something to me if I file for guardianship."

On March 25, 2019, the social worker and an officer approached and spoke with Mother. However, "[a] full global assessment was not completed due to [Mother's] unwillingness to participate." Mother denied hitting Minor and using drugs. The social worker requested that Mother drug test and also offered a list of service referrals; Mother declined the referrals and did not drug test.

The Department scheduled a "Child Abuse and Neglect" examination for Minor. Mother did not make Minor available for the exam.

On March 28, 2019, MGM called the social worker frantic and crying; she stated that Mother came home the night prior without Minor. Mother was contacted but she refused to disclose the location of Minor. Mother stood close to the officer's face and swore at the officer but the officer was able to deescalate the situation and Mother provided Minor's location. The social worker met Minor and she appeared fine.

Mother agreed to an oral drug test; the test was invalid because Mother could not produce enough saliva. Mother agreed to an on-demand urine test but failed to show for the test and when the social worker tried to call Mother the phone was disconnected. Minor was taken into protective custody.

According to the detention report, Mother had past child welfare history from 2016 to 2018. All the allegations were determined to be unfounded. In September of 2018, the Department investigated a general neglect and physical abuse referral. Although Mother admitted that she "whoop[ed]" Minor, Minor appeared well taken care

of by her maternal grandparents. Minor stated she felt safe at the home and did not have any marks or bruises. On April 2018, the Department received a general neglect and physical abuse referral. In October 2017, the Department received two general neglect referrals. The maternal grandfather (MGF) had obtained a restraining order and an immediate move-out order on Mother; Mother was arrested for refusing to comply. Mother also hit and argued with MGM. The referrals were unfounded because Minor felt safe with her maternal grandparents and they provided care for Minor.

During these prior investigations, the Department provided the family with services. The services included counseling, drug testing, dental appointments, and transportation-assistance offers.

On April 3, 2019, the Department filed an amended section 300 petition. In the amended petition, the Department alleged that: (1) Mother physically abused Minor (§ 300, subd. (b)(1); (2) Mother abused controlled substances (§ 300, subd. (b)(2); (3) Mother failed to benefit from preplacement preventive services including referrals to substance abuse treatment programs and testing, and failed to ensure Minor attended appointments (§ 300, subd. (b)(3); (4) Mother neglected the educational needs of Minor (§ 300, subd. (b)(4); and (5) Mother neglected Minor's medical needs (§ 300, subd. (b)(5)).

At the detention hearing on April 4, 2019, the juvenile court detained Minor from Mother. Mother denied the allegations in the first amended petition. The court ordered services for Mother including alcohol and drug testing, parent education, substance abuse treatment, counseling, and any others the Department deemed appropriate. Mother was

to submit to a hair follicle and urine testing. Mother was to have two supervised visits a week. As to Minor, the court directed she be scheduled for medical assessments, referred for counseling, and to be provided with tutoring as needed; and the Department was to attempt to keep Minor in her school of origin. The Department was to seek relative placement for Minor, and visitation with grandparents and extended relatives could occur as approved by the Department. An after-court visit was ordered for mother and extended family with Minor. A jurisdictional hearing was ordered for April 26, 2019, with Mother to appear without further notice.

On April 22, 2019, the Department filed its jurisdiction/disposition report. The Department made seven unsuccessful attempts to meet Mother for the report. The social worker texted her, contacted the maternal grandparents, spoke to Mother and scheduled an appointment. Mother did not attend the appointment.

MGM said Mother "is just one of those young adults that just didn't need to have a child, she don't love her or take time for her." MGM has treated Minor as her own and planned to move into her own apartment so she can have Minor placed with MGM.

In her forensic interview, Minor stated that Mother "whoops me with extension cords on all parts of my body and it hurts." Minor also stated that Mother hits her all the time. Mother hits "with the cord form the iron, the comb, brush, and threatened me with the iron." Minor had bruises on her body in the past. She also had not seen a dentist or doctor for a long time. Mother consumed substances that made her act up and say "weird" things. Minor was too tired to attend school because she "was up hanging out all

6

night" with Mother. The physical examination revealed severe dental decay, scars and abrasions on her body. Minor made statements regarding excessive physical discipline.

The Department scheduled Minor for medical and dental appointments. Mother neither cooperated with the Department to schedule the appointments nor provided Minor's medical and health information. Minor was referred for initial mental heath and medication support assessments and after-school tutoring. MGM agreed to hold Minor's educational rights.

Prior to a visit with Mother, Minor expressed fear and asked the social worker to be present. When Mother visited on April 15, 2019, she was disengaged from and did not talk to Minor, even with prompts form the visitation monitor. She declined to visit on April 9, 2019, and failed to confirm two other visits.

At the jurisdiction hearing on April 25, 2019, the juvenile court ordered the RCAT interview to be released to the Department and that an addendum report be filed including the RCAT, mother's "input," and the status of Minor's dental treatment. An after-court visit between Minor, Mother and MGF was also ordered. Thereafter, the court authorized visitation with MGF as approved by the Department. The court set a contested jurisdictional hearing for May 21, 2020.

On May 17, 2019, the Department filed an addendum report, which indicated Mother had minimal progress in her case plan. Minor remained in foster care. Visits between Minor and Mother, and Minor and MGM continued to be supervised and at the discretion of the Department. Minor's dental needs were being addressed, and the RCAT report had been provided to Department attorneys.

As to Mother, the social worker reported that Mother stated she had a "rough childhood" and did not have a good relationship with MGM. Mother did not have any medical conditions and denied taking medications. She admitted smoking marijuana but denied taking other substances.

On April 20, 2019, the Department discussed concurrent planning with Mother. Mother was told that if she were offered services, she would have 12 months to complete her case plan because of Minor's age but "if she failed to complete the services; the Department could recommend that services be terminated. A possible consequence is the termination of her parent rights, leading to the adoption or legal guardianship of [Minor]." Thereafter Mother agreed with participating in individual counseling, family counseling, anger management classes, and parenting classes. Substance abuse services would be evaluated once a urine analysis and hair follicle drug test were completed.

On April 23, 2019, Mother completed her urine analysis drug test; she tested positive for marijuana. On April 26, 2019, Mother stated that no one had contacted her to conduct the hair follicle drug test. That same day, Mother had a two-hour supervised visit with Minor. The visit went well and there were no concerns noted.

On May 3, 2019, Mother failed to attend a visit with Minor. Three days later, Mother contacted the social worker to update her contact information and to apologize for missing the visit. The social worker provided Mother with contact numbers so she could enroll in services, and contacted service providers to update Mother's contact information. The referral for the hair follicle drug test was resubmitted.

On May 5, 2019, Mother participated in a 90 minute supervised visit with Minor; the visit went well with no reported concerns.

On May 13, 2019, Mother told the social worker that she would start parenting classes on May 15, and the start dates for individual counseling and anger management were pending.

In the addendum report, the social worker summarized that Minor was removed from Mother's custody for physical abuse and severe medical neglect. Mother did not appear to understand that she should not use "objects" when "discipling" or "hitting" Minor. The social worker believed that this failure to understand placed Minor at substantial risk of continued physical abuse. The social worker worried that if Minor were returned to Mother without supervision, Mother would continue to physically abuse and neglect the medical and educational needs of Minor. Since the last court hearing, Mother had made minimal progress with accessing services to learn new skills. The social worker believed that Mother had some unresolved issues that occurred in her childhood—limiting her ability to parent. Minor stated, "I love my mom and I want to see my mom, but I do not want to live with my mom." Therefore, the social worker recommended that the court find true the allegations alleged in the first amended petition. The social worker also recommended that Mother be offered family reunification services.

At the jurisdictional hearing on May 21, 2019, the court found good cause to continue the hearing.

In the status review report filed November 21, 2019, the Department recommended that Minor remain a dependent, that family reunification services continue to Mother, and visitation between Minor continue as directed by the Department. The social worker reported that Mother, who was 32 years old at the time, lived with MGF and the maternal uncle (18 years old) in Riverside. Mother was not employed at the time. Mother only paid for her cell phone service of $60 per month; she did not pay for rent or utilities. Her social support was MGF.

As to Minor, medical and dental examinations were completed. She was active and liked to play. Minor, however, started fighting with her foster sibling and became more difficult to redirect. Minor was having violent outbursts and temper tantrums when she did not get her way, and she "did not like to tell the truth." On October 24, 2019, the social worker submitted a Wraparound referral; it was approved on October 30, 2019. Minor received mental health services and was waiting additional services.

The social worker was working on relative placement with MGM. Minor and MGM had weekly supervised visits.

During this reporting period, Mother missed five visits. During visits, the social worker had to redirect Mother on several occasions not to threaten Minor with bodily harm. The social worker heard Mother saying, "you listen to me or I'm going to hit you, don't think just because they are here that you won't get a wippin."

The social worker provided information regarding Mother's participation in services for counseling, classes and psychological evaluations. The Department recommended services continue. Mother confirmed that she had all of her referrals but

she had not completed her individual counseling, parenting educational program, psychological evaluation, and her medication evaluation. Mother made minimal progress during the reporting period. The social worker noted Mother had poor insight about her triggers and why Minor was removed. Mother lacked logical thinking and took no responsibility for her actions that led to Minor's removal. The social worker contacted Mother on a monthly basis to discuss Mother's case plan compliance and current circumstances.

On December 3, 2019, the Court ordered that a second dental assessment, placement with MGM, medication assessment, remedial tutoring, and special education continue to be pursued for Minor. Visits with mother were to continue as previously ordered. The court set a status review hearing under section 366.21, subdivision (f), for May 29, 2020.

On May 19, 2020, the Department filed a status review report. The Department recommended Minor remain a dependent of the court and that family reunification services continue for Mother. Mother was still living with MGF and was unemployed. She had not completed her individual counseling, parenting or anger management classes. On March 22, 2020, Mother had contacted the Department to request her referrals again. On March 25, the social worker again provided Mother the referrals. Mother was placed on a waiting list for parenting and counseling services. She did make some progress and reached out to her service providers, such as completing a psychological evaluation with Dr. Garrett. Mother continued to lack insight into why Minor was removed from her care. The foster parents reported that Minor continued to

11

be difficult to redirect. She was diagnosed with ADHD and prescribed medication. Minor continued to have visits with Mother and MGM.

Mother's participation in face-to-face visits was sporadic. However, since the COVID-19 pandemic began, Mother and Minor participated in supervised phone contact once a week for an hour; these visits were appropriate.

At the May 29, 2020, status review hearing, the court ordered the Department to provide Mother's psychological evaluation to all counsel. The court ordered a referral for Minor to receive remedial tutoring and for Wraparound services to continue. The court set a contested review hearing under section 366.21, subdivision (f), for July 8, 2020.

On July 2, 2020, the Department filed an addendum report recommending Minor remain a dependent of the court, reunification services for Mother be terminated, and to set a selection and implementation hearing. On June 1, 2020, Minor was placed in a different foster home.

On June 8, 2020, the social worker reviewed Mother's psychological evaluation from Dr. Garrett. Dr. Garrett diagnosed Mother with histrionic personality disorder with paranoid, narcissistic and turbulent features. He stated, " 'At this point [Mother] has not learned very much from having lost custody of her child for a whole year. She is still argumentative and angry towards the Department of Social Services and the Social Workers as well as her mother and seems to blame the situation on everyone but herself. I question whether she will benefit from psychotherapy and do not believe that she should have any extended amount of psychotherapy. I would say after six sessions that the counselor should report to the social worker and judge as to whether she is gaining any

capacity whatsoever to look at herself honestly and take any responsibility for her situation. If she does not seem able to do that, I think the psychotherapy should be terminated." Dr. Garrett also went on to state that Mother should complete a parenting program to learn how to properly discipline Minor. Dr. Garrett stated that "[t]he great risk here is that if [Mother] is reunified with her daughter without true and sincere alteration in her attitudes that abuse will continue, and that [Minor] will begin to act out much more severe behavioral problems as she enters adolescence. At this point she has to prove a great deal to the Department of Social Services prior to being allowed more access to her child in her supervised weekly visits that she is currently allowed."

As to Minor, she received tutoring services and continued receiving services. On June 10, 2020, the social worker received a telephone call from Minor's new foster mother regarding a video visitation between Minor and Mother. The foster mother observed Mother lying in bed with another woman smoking what appeared to be marijuana. Minor told Mother, "Mom you know I don't like when you do that." Minor presented as emotional and upset. The foster mother, therefore, ended the video visit. The social worker advised Mother that all subsequent visitation should take place over the telephone with no video until in-person visitations are resumed. When the social worker questioned Mother about the last video visit, Mother denied the events as reported by the foster mother. Minor, however, told the social worker that Mother was smoking during the call and she was mad at her mom for smoking "that stuff again." Minor was doing well in her new placement. The foster parents and Minor were loving toward each other and the foster parents wanted Minor to stay with them long term. Minor stated that

she did not want to talk to Mother on the phone and expressed to the foster parents that she is afraid of Mother when she gets angry.  The social worker, therefore, opined that the visitation should be at the discretion of Minor or held in a therapeutic setting."

At the hearing on July 8, 2020, the juvenile court directed the Department to determine if in-person or therapeutic visits were necessary; provide counsel with a complete psychological evaluation; and to provide an addendum report addressing Mother's progress, visitation, the necessity of therapeutic treatment, and whether in-person visits were a detriment to Minor.  The court continued the hearing to August 25, 2020.

In the addendum report filed on August 20, 2020, the Department indicated there was no change in recommendations, family reunification services should be terminated as to Mother, and a section 366.26 hearing should be set.  On July 20, 2020, Mother was given a new referral for anger management as requested by Mother.  Mother was in the fourth week of her parenting program.  She continued to have supervised telephone visits with Minor when Minor wished to do so; however, Minor had not wished to do so because of the last video visit  The Wraparound team was assisting Minor to express her feelings and to encourage visitation with Mother, but then on July 27, 2020, during a video visitation, Mother asked Minor if she told the social worker if Mother smoked during the prior visitation.  Mother seemed angry and Minor started to cry.  She told Mother she did not tell the social worker, and the call ended.  Afterwards, the caregiver told Minor that she had told the social worker about Mother's smoking.  On a visit on August 11, 2020, Mother was very apologetic, polite and loving to Minor.

As for the permanent plan, the social worker reported that MGM had not been approved yet for placement and had been in the hospital getting treatment for COVID-19. After her release from the hospital, she was under home quarantine. MGM had no contact with Minor after being diagnosed, but also did not visit with Minor prior to her hospitalization. The foster parents liked Minor and were thinking about providing permanency for Minor. They had grown to love Minor and stated, "she is a wonderful child. Yes, she has issues like every other child but they are manageable. [Minor] is easily redirected with Wrap[around] in the home. [Minor] is doing well."

As for Mother's progress, Dr. Garrett had recommended Mother participate in a parenting program through MFI Recovery. When asked about the parenting program, Mother stated that MFI was not taking any referrals. The social worker called and inquired and was informed that MFI was taking referrals. Mother continued to exhibit inappropriate behavior during supervised video visits with Minor.

Minor continued to progress well in her new placement. The foster parents were caring and loving toward Minor and wanted her to stay with them long term. Minor communicated with MGM and the Department was hopeful that MGM would be a certified placement for Minor shortly. Minor did not want to talk to Mother on the phone; the Wraparound team encouraged Minor to communicate with Mother.

At the contested hearing on August 25, 2020, the court continued Mother's reunification services. The court ordered the Department to assess for in-person visitation between Minor and Mother, to communicate with Mother's parenting program provider and to provide a status update on Mother's progress in therapy. The court also

ordered the Department to provide a status update on placement of Minor with MGM. The court set a permanency review hearing under section 366.22 for September 28, 2020, and ordered both Mother and Minor to appear.

On September 15, 2020, the Department filed a section 366.26 18-month permanency review hearing report. In the report, the Department recommended Minor remain a dependent of the court, that family reunification services be terminated to Mother, and a selection and implementation hearing be scheduled. The Department also requested that visitation between Mother and Minor be once a month.

Mother continued to reside with MGF and maternal uncle in Riverside, she was still unemployed, and she did not pay rent or utilities. The social worker noted that a search of the court website revealed a misdemeanor arrest warrant for Mother stemming from a charge to endanger/willfully harm a child in March 2019.

Minor had become aggressive with the caregiver, had been fighting with the caregiver, and had become more difficult to redirect. The foster mother reported that Minor was having violent outbursts and temper tantrums, and that in late August, Minor blamed the foster mother as the reason Minor could not live with MGM. The social worker drove to the foster home and spoke with Minor in person. The social worker explained to Minor that she was unable to move in with MGM because there were "some things that [MGM] had to take [care] of first." Minor stated she understood and that she would not become aggressive with the foster parent again. During this time, Minor continued to receive Wraparound services. On September 2, 2020, the social worker received another call from foster mother reporting that Minor was very aggressive and

assaultive, hit the foster mother, and bit an older foster sibling in the face. Minor also destroyed furniture and attempted to stab the foster mother with a pair of scissors. The foster mother called the Wraparound team. When Minor's therapist conducted an assessment and tried to calm Minor down, her behavior only escalated as Minor tried to choke herself and hit the walls in the foster home. They decided that the foster mother should call the police because Minor was attempting to hurt herself. When the police arrived and spoke with Minor, Minor said she did not want to harm herself and attempted to wet the police with the water hose. The police told the foster mother that they were unable to help. The foster mother stayed with Minor in the front yard for three hours so she could calm down. When the social worker arrived at the foster home, she asked Minor about her behavior. Minor stated she did not know why she was acting out. The social worker stayed there for an hour. During this time, the foster mother gave a 14-day notice for a change of placement.

With regard to her education, the social worker reported that Minor, although in the fourth grade, was performing at a kindergarten level. Minor was receiving services to help with her education.

Minor had been participating in Wraparound services since October 2019. A family team meeting was held on September 4, 2020. The Wraparound team, the foster mother, Minor, the foster agency social worker, and the county social worker were present—"to try to salvage the placement." The foster mother agreed to allow Minor to stay in her placement until a new foster placement was located. During the meeting, "the foster mother reported that [Minor] has become aggressive after visiting [MGM], stating,

17

'When [Minor] come[s] back from visiting [MGM], [Minor] is rude and does not want to follow directions. In addition, [Minor] says that [MGM] talks to [Minor] about living with her and discusses future placement" with MGM. As for the placement with MGM, the social worker spoke with MGM and "she reported that her home is not cleared through the Knott FFA because her roommate need a criminal exemption. In addition, [MGM] is employed during the day and would not be available to assist [Minor] with online learning."

As to Mother's services, Mother informed the social worker that she completed her parenting classes on August 23, 2020. Mother, however, could not provide the parenting education certificate and stated that "the parenting program was a waste of her time and she didn't care about the classes honestly." As to individual counseling, Mother had her first appointment in August 2019 and her last appointment in September 2019. The social worker and Mother discussed individual counseling referrals again in March, April, May and June of 2020. Although Mother was given additional time, Mother failed to enroll in individual counseling.

Mother continued to have supervised telephone calls with Minor when Minor wanted to talk to Mother; however, Minor did not want to speak with Mother on the phone after the video chat incident where Minor saw Mother smoking.

The social worker opined that there was not a substantial possibility that Minor could return to the care of Mother by the next court date. Mother had not demonstrated that she had mitigated the circumstances that brought her before the court; Mother needed to enroll in individual counseling and complete her anger management program, and as

noted in current and prior reports, Mother displayed no remorse in her behavior that led to Minor's removal.

At the permanency review hearing on September 28, 2020, the juvenile court authorized conjoint counseling between Mother and Minor upon the recommendation of Minor's therapist. The court extended visitation between Minor and MGM and continued Minor's Wraparound services. The court set a contested section 366.26 review hearing for October 30, 2020.

On October 22, 2020, the Department filed an addendum report recommending Minor remain a dependent of the court, that family reunification services be terminated as to Mother, that a section 366.26 selection and implemental hearing be calendared, that no visitation occur between Minor and Mother, and that visitation between Minor and MGM continue.

On September 25, 2020, Minor was discharged from Loma Linda Behavioral Center after a five-day hospital visit where she was assessed for depression and angry outbursts. Minor was discharged with a prescription for Prozac for depression, Concerta for ADHD, and Melatonin for insomnia. On September 28, 2020, the court ordered an extended visit with MGM. On October 7, 2020, Minor had a medication evaluation with Dr. Nguyen with the Wraparound program. The doctor did not prescribe any psychotropic medication for Minor. Dr. Nguyen indicated Minor had stopped taking her medication since moving in with MGM because "she has not had any further symptoms since being in her new placement." The Wraparound team was providing support to MGM.

MGM was in the process of being approved as a foster parent. She wanted to provide Minor with a permanent home. Minor "she loves living with [MGM] and there have been no concerns noted." As to Minor's education, MGM worked to reenroll Minor in her school of origin. MGM picked up the necessary forms and school supplies, requested for an Individual Educational Plan (IEP) meeting, and touched base with Minor's previous teacher to seek additional help. On October 15, 2020, Minor started at the school with a special education plan.

As to visitation between Mother and Minor, Mother missed a scheduled visit on September 30, 2020. When the social worker asked why Mother missed the visit, instead of being remorseful, "she demanded that [the social worker] reschedule the visit." The next scheduled visit was on October 7, 2020. In the morning, Mother texted the social worker and stated that if Minor's hair was not "done," she was going to bring someone to do it. The social worker needed the name and date of birth of the person that would accompany Mother so the social worker could clear him or her before the visit. Mother texted back with two names. When the social worker informed Mother that she could bring one other person, not two, Mother insisted that "both" were coming. At the end, Mother texted, "NVM who do I need to talk to I'll do it the shit myself, realistically her hair should've been done in the first place there's no reason the kids hair is not combed." The social worker responded that Minor was with MGM now and asked if MGM knew how to brush Minor's hair. The social worker again reminded Mother that visits were restricted due to COVID-19 but that she would allow another person to accompany Mother if she provided the social worker with the requested information. Mother

responded: "Bitch you're lucky if I say another nice word to you I ask who the fuck I can speak to because you don't know how to do shit. I don't start with me Lisa! gave you the name like you asked do your work. The next message I should be getting from you is the person to call." (*Sic*.) Although the social worker indicated that Mother's message was unclear, the social worker provided Mother with her supervisor's name and phone number. Mother responded, "You a dumb bitch . . . . And all y'all go to be some dumb bitches till y'all start doing your job." (*Sic*.) Mother continued to have supervised visits at the Department on a weekly basis. MGM agreed to supervise the telephone visits.

As to individual therapy for Mother, on October 1, 2020, Mother texted asking for her referral information for individual counseling. The social worker had resubmitted for individual counseling two months prior in August 2020 and the social worker provided Mother with the referral. By October, MFI Recovery was no longer taking referrals. However, back in August, MFI Recovery was taking referrals. Mother demanded that she be given a referral for individual counseling with her anger management therapist. That counseling center did not take Medi-Cal insurance for individual counseling. When the social worker explained this to Mother, she became upset and did not believe the social worker. Eventually, the social worker referred Mother to another therapist at Community Access Network on October 2, 2020. On October 19, 2020, the social worker called Community Access Network and learned that Mother started individual therapy on October 7, 2020.

As for anger management classes, Mother completed eight sessions and had eight sessions left. The social worker noted that Mother clearly had failed to benefit from her

program as evidenced by her inability to use the skills acquired during her classes when she failed "to deescalate her anger which [led Mother] to engage in cursing and profanity when she [did] not get her desired outcome." Mother had completed only one session of individual therapy—she had 18 months to complete her court-ordered services but failed to do so. The Department also reminded the court about Mother's psychological examination report, included in the 12-month review report.

On September 25, 2020, MGM related that she blocked Mother from all telephone calls "after they had a verbal altercation and reported she doesn't really have communication with [Mother] because [Mother] continues to engage in verbal altercations with her." MGM stated, "I don't have the time or the energy to put up with [Mother]. I just want to raise my granddaughter. [Mother] has always been mean. . . . I use[d] to tell my husband, there is something wrong with [Mother] but he always took [her] side. I never had his support. I am divorced now and have good support at my church. They all love [Minor]." MGM stated that she wanted the Department to assist with supervised visits between Mother and Minor. When the social worker spoke with MGM on October 16, 2020, MGM agreed to supervise telephone visits between Mother and Minor and unblock Mother. MGM was concerned about Mother because of her inappropriate behavior and language toward Minor.

Since the last hearing, Minor had been placed with MGM and the Wraparound team continued to provide services. Minor was no longer on psychotropic medications for behavior. Minor was reenrolled at her school of origin and MGM was facilitating Minor's needs at her school. Minor's special educational teacher and the school

psychologist were working together. Minor is "happy and is enjoying school." The social worker observed Minor to be happy and affectionate with MGM; Minor kissed and hugged MGM during a Wraparound meeting. Minor stated she loved MGM and liked living with her.

At the contested review hearing on October 30, 2020, Mother testified. She claimed that Minor was removed from her care because Minor was not attending school or going to the dentist on a regular basis. Mother believed that she had remedied these issues because she can now drive Minor with her driver's license. Although she was not previously involved in Minor's education, she would be involved now.

Mother testified that she participates in parenting education by Zoom. She also stated that she loved her anger management classes; she felt those classes had been helpful. She also enjoyed her visits with Minor. She had not had face-to-face visits with Minor for seven months due to the pandemic but she did have telephone contact. Mother's visits with Minor were positive. Mother claimed that the social worker did not communicate with Mother. She had not seen the social worker face-to-face for seven months. Even though the social worker gave Mother referrals to services, Mother did not feel the social worker was helping her reunify with Minor.

During cross-examination, Mother testified that during her parenting education course she learned she was "already doing those things," such as showing empathy and holding your child. Mother did not benefit from the class and felt that taking another parenting course would not be helpful. She only did it to get her child back.

Mother also testified that she started counseling in October 2020. She did not start prior to then because she wanted her anger management counselor to provide the therapy. Mother had stopped counseling in 2019 to look for a job out of state and did not have a car to make it to appointments.

In her anger management program, she learned to count to 10. She did not feel that she had a problem with anger prior to Minor's removal, and still did not have anger issues. Mother counted to 20 before she sent the October 7, 2020, text message to the social worker. In the text, Mother repeatedly called the social worker a "bitch" for not allowing Mother to bring two people to a supervised visitation to help fix Minor's hair. When asked whether Mother learned that she should not be hitting Minor, Mother answered that she learned that she "should have been taking her to the dentist, that I should have been doing her homework with her." She did not state anything about not physically hurting Minor.

Mother's counsel argued that Mother engaged in services and had a very close bond with Minor. Counsel requested additional services. Minor's counsel argued that although Mother went through the motions of engaging in some services, she did not benefit from them. The Department agreed with Minor's counsel and added the dependency had been ongoing since April 2019 and during that time, Mother failed to acknowledge the reason for Minor's removal, and was still argumentative and angry.

After hearing Mother's testimony and arguments from counsel, the juvenile court indicated that Minor was removed primarily due to Mother's inappropriate physical discipline of Minor and anger management issues. The court found that Mother delayed participating in services and sensed "from mother, even through her testimony that you are very angry." The court expected to see more cooperation from a parent after 18 months of services. The court found Mother had not "truly benefited even from the services that she received," and she did not regularly participate in services. In sum, the court found Mother failed to participate regularly in reunification services; did not make substantive progress in a court-ordered treatment plan; and there was no substantial probability that Minor would be returned if given another six months of services. The court therefore terminated reunification services as to Mother. The court ordered Minor's placement information to remain confidential. Moreover, the court ordered extended visits between the child and MGM to continue pending RFA[2] approval. The court authorized Mother to have community visits with Minor and to assess MGM to supervise visits. All prior visitation orders were to remain in full force and effect. The court set a selection and implementation hearing under section 366.26 for March 1, 2021. The court also set a review hearing under section 366.3 for the same date.

On November 5, 2020, Mother filed a notice of intent to file writ petition.

---

[2] Resource Family Approval Program (https://www.cdss.ca.gov/inforesources/resource-family-approval-program).

25

## DISCUSSION

In her writ, Mother argues that the Department "failed to provide to Mother any meaningful reunification services to . . . Mother during the contested reunification period." (All caps. omitted.) For the reason set forth *post,* we find the court's order terminating services is supported by substantial evidence.

On appeal, our review is limited to whether the appellate record discloses substantial evidence to support the juvenile court's finding that the Department made reasonable efforts to facilitate reunification, recognizing that the standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances, since "[i]n almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547 (*Misako R.*).) "Services will be found reasonable if the Department has 'identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult.' " (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972-973.) It is the agency's obligation at the six-month review hearing to make a record that reasonable services were provided. (*In re Precious J.* (1996) 42 Cal.App.4th 1463, 1478.)

"The adequacy of a reunification plan and of the department's efforts are judged according to the circumstances of each case." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1362; accord, *Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1011.) Relevant circumstances include a parent's willingness to participate in services. Reunification services are voluntary, and the department cannot force an unwilling parent to participate in the case plan. (*Ronell A.*, at p. 1365.) The department is not required to "take the parent by the hand and escort him or her to and through classes or counseling sessions." (*In re Michael S.* (1987) 188 Cal.App.3d 1448, 1463, fn. 5.) Therefore, in assessing the reasonableness of reunification services, the juvenile court evaluates not only the Department's efforts to assist the parent in accessing the services, but also the parent's efforts to avail himself or herself of those services.

Moreover, "with regard to the sufficiency of reunification services, our sole task on review is to determine whether the record discloses substantial evidence which supports the juvenile court's finding that reasonable services were provided or offered." (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762 (*Angela S.*).) In doing so, we must review the evidence in the light most favorable to the prevailing party and indulge all reasonable inferences to uphold the court's ruling. (*Misako R.*, *supra*, 2 Cal.App.4th at p. 545.) "If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed." (*Ibid.*)

The record in this case, set out *ante*, reveals the services offered were reasonable—they were tailored to fit the circumstances and to eliminate the conditions that led to the juvenile court's jurisdictional finding—and Mother consented to them.

In this case, Minor was removed from Mother's custody due to inappropriate discipline, anger management, and general neglect issues. Minor stated that mother hit her with objects on all parts of her body and it hurt. Mother hit Minor "with the cord from the iron, the comb, brush, and threatened [Minor] with the iron." While investigating the referral in March of 2019, the Department offered Mother the opportunity to address the issues without removal; however, Mother was resistant to and declined services. MGM was afraid of Mother's reaction if MGM filed for legal guardianship—Mother had a child welfare history that included hitting and threatening MGM. MGF obtained a restraining and move-out order against Mother, and Mother was arrested for failing to comply. During its prior investigations, the Department provided the family with services such as counseling, drug testing, dental appointments, and transportation assistance.

After filing the petition, on April 29, 2019, the Department referred Mother to a substance abuse program, and parenting and anger management services. The social worker left voice messages with the information and contact numbers for Mother. Mother did not enroll in any of the services. On July 5, 2019, the Department again provided Mother the referrals for services in order to reunify with Minor including parenting education, individual therapy, anger management, and a psychological evaluation. The social worker contacted Mother regularly to discuss her case plan compliance and current circumstances.

Throughout the dependency, Mother failed to regularly participate in her services. She delayed attending her psychological evaluation until March 26, 2020. Moreover, although she attended a few counseling sessions between August 22 and September 12, 2019, she stopped going to therapy for over a year. Mother requested a new set of referrals on March 22, 2020, which the Department provided on March 25. Mother initially claimed that her parenting education provider was not taking any new referrals but the social worker confirmed that the provider was, in fact, taking new clients. Mother enrolled in a parenting education program but failed to sign a release for the Department to check on the quality of her participation. After completing the program in August of 2020, Mother stated the program "was a waste of her time and she didn't care about the classes honestly." At the October 30, 2020, hearing, Mother testified that she learned she "was already doing those things" that she needed to do. Mother did not feel she benefitted from the classes, she only took them to get back her child. Mother also testified another parenting course would not be helpful.

In addition to the parenting classes, the Department provided Mother another set of referrals for anger management classes and individual counseling on July 20, 2020. In August 2020, the social worker gave Mother another referral for counseling, which Mother failed to attend.

At the 12-month status review hearing on August 25, 2020, the trial court continued Mother's services to the 18-month review hearing date of September 28, 2020. At that hearing, the court found the Department had provided reasonable services. Mother did not file an appeal or writ.

As noted in detail above, on October 1, 2020, Mother texted the social worker asking for a referral to a specific therapist—one who was not covered under Medi-Cal. When the social worker informed Mother, she became angry and belligerent in her texts back to the social worker. The social worker then referred Mother to another therapist. Mother did not begin her individual counseling until after the initial 18-month hearing.

Based on the foregoing, substantial evidence supports a finding that the Department provided Mother with reasonable services. Mother, however, delayed enrolling and participating in the services.

The evidence supports a finding Mother failed to benefit from the services. At the hearing on October 30, 2020, Mother testified she had completed eight anger management sessions but she did not feel she has or ever had a problem with anger. She also did not feel she disciplined Minor inappropriately. As noted *ante*, Mother stated she was already "doing those things," such as showing empathy to her child. She did not feel she benefitted from the parenting classes and did not think another course would be helpful. Even when asked during cross-examination whether Mother has learned she should not be hitting Minor, she did not concur; instead, Mother responded she should have taken Minor to the dentist and done homework with her. In addition, although Mother claimed she learned to deal with her anger, her display of anger at the hearing and to the social worker throughout the dependency showed otherwise. As noted *ante*, on October 7, 2020, Mother sent text messages to the social worker wherein Mother repeatedly called the social worker a "bitch" because she would not allow Mother to bring two additional people to visit Minor due to the pandemic.

Dr. Garrett provided in his psychological evaluation of Mother that Mother has not learned from having lost custody of Minor. He noted that Mother "is still argumentative and angry" with the Department, the social worker, MGM about Minor's removal, and blames the situation on everyone but herself. Mother did not show any remorse about her current child welfare case.

After hearing Mother's testimony and reviewing the record in this case, the court found that Mother has not "truly benefitted even from the services that she received." Mother also did not regularly participate in services. If Mother felt during the reunification period that the services offered to her were inadequate, she had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan. She did not. (*In re Christina L.* (1992) 3 Cal.App.4th 404, 416.)

After reviewing the reporter's and clerk's transcripts on appeal, discussed in detail *ante*, we conclude the record contains substantial evidence to support the juvenile court's finding that services provided to Mother were reasonable. Mother received 19 months of services but failed to benefit from the services. As in *Angela S.*, *supra*, 36 Cal.App.4th 758, Mother's "real problem was not a lack of services available but a lack of initiative to consistently take advantage of the services that were offered." (*Id.* at p. 763.) The evidence shows Mother's case plan was tailored to fit her circumstances and the Department made reasonable efforts to assist her to comply with her case plan. Hence, the services provided, while not possibly perfect in every regard, were clearly reasonable under the circumstances (*Misako R.*, *supra*, 2 Cal.App.4th at p. 547), and the juvenile

court's finding that reasonable reunification services were provided is supported by substantial evidence.  (See *Angela S.*, *supra*, 36 Cal.App.4th at p. 762.)

## DISPOSITION

The writ petition is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORT


MILLER
Acting P. J.


We concur:


SLOUGH
J.


FIELDS
J.